Our next case is 417-0115, People v. Coffman. For the appellate is Byron Reyna? Yes, Your Honor. It's Brian. Brian. Everybody does it. Oh, it's Brian? It's Brian. Did I pronounce your last name correctly, sir? Reyna. Reyna? Yes. Okay. And for the appellee is James Ryan Williams? Okay, Mr. Reyna, you may proceed, sir. Good morning, Your Honors. Counsel, may I please report? Counsel. Your Honors, this is a case where the trial court admitted Joseph Coffman's videotaped confession, even though police failed to scrupulously honor his communication of his Miranda rights, thus allowing the state to present and utilize strong evidence of intent in a case where Joseph's mental state was at issue. The court also denied the defense request to issue the involuntary manslaughter instruction, depriving the jury of the opportunity to fully consider the difficult question of Joseph's mental state. Regarding the admission of Joseph's confession, Joseph first invoked his Miranda rights on July 19th, 2014, when he talked to two state's police agents. Two days later, he asked to talk to Sergeant Greenwood, who had him taken to an interrogation room and advised him of his Miranda rights. After acknowledging his Miranda rights, Joseph initially indicated he wanted to talk about his brother Dennis' children. However, when Greenwood changed the topic to the offense, stating that he had listened to the 911 calls and wanted to know where the offense occurred, Joseph said he did not want to talk anymore until he talked to an attorney. He said he didn't want to talk about that. He said he didn't want to talk about that anymore until he talked to an attorney. Identify one question asked by the investigator after that, that inquired about the facts of the case. Well, you know, I think the first question after that that related to the facts of the case was, once Joseph said, I want to talk to an attorney before talking about that, the investigator said, do you want to talk about anything else? He had asked the investigator to come and talk to him, had he not? He did. Okay, so did the investigator then say, what is it you wanted to talk to me about? Yes, it is reasonable to ask that. So after that, identify one question asked by the investigator that interrogated him on the facts of the case. Well, Your Honor, the question is whether he continued the interrogation. So interrogation doesn't necessarily require a direct question about the facts of the case. I mean, here we have 45 minutes of prolonged questioning that related to his family. And in this case, this case in particular, the family is really intricately connected to the offense because the victim is his brother. And so I think when the officer is asking about his family and talking about his family, he is asking about the offense and crossing a line that Joseph simply said he didn't want to talk about. What case says that that's an interrogation in violation of his Miranda Act? Flores and R.C., the Supreme Court case. Now, Flores is old news. Well, both of those cases, the Illinois Supreme Court and R.C. and Flores were a district case. You watched the video, right? Yes, absolutely, Your Honor. Of course you did. Forty-three years I've been at this. Twenty-five as a lawyer, half of that as a prosecutor, the other half as a criminal defense lawyer. I have to say that of all the interviews I have witnessed, that rates among one of the least interrogative interrogations I've ever seen in my life. They had a conversation. Yes, the cop knew what he was doing and he was very good at it, but he didn't interrogate him on the facts of the case whatsoever. In fact, he kept asking the guy, what do you want to talk about? Ask me questions. The fact that he happens to be good doesn't make it illegal. Well, I think, Your Honor, when you say the cop knew what he was doing, it sounds to me like, correct me if I'm wrong, but like a recognition that the officer is there to continue the interrogation and to keep Joseph talking. It's an interrogation technique to keep Joseph talking. He's been asked to come. He's also, since that, invoked his rights. Well, he didn't say, I don't want to talk to you anymore. He said, I don't want to discuss that until I've talked to an attorney. And he said, okay, fine. When the officer says at this point, what do you want to talk about, in response to having been summoned to the jail by the defendant, how can that possibly be an impropriety? More specifically, using your language, it's at that point the officer crossed the line, is what I heard you say earlier. What is it about that point that Justice Steigman is asking you about after the question was asked that crosses the line? Is the officer required to leave once the defendant states he'd like an attorney? So my question is, what crosses the line? I'm sorry. The court has an R.C. questioning all questions posed to stop. So I think, you know, in this case, I think it would be reasonable. Well, I think there are cases where it could be reasonable where there's some kind of follow-up question. I don't think it was unreasonable in this case for the officer to say, well, what do you want to talk about? However, the state's position and the officer's position was that his concern was just his mental health. And if that's the concern, to keep him talking. Let's pause right there. Why do we care what his concern was? Because it could be true or pretextual. Isn't the focus not just literally, but solely upon what was said and whether or not this was an improper question? I don't want to get into both of them. Your Honor, the question is whether he started to scrupulously honor his indication of his right, Miranda Wright specifically, his right to counsel. I want to go back to the question I asked you. He says, I don't want to talk about that. And was there any impropriety in the officer saying, who's now been summoned to the jail? No dispute about that, is there? That the defendant re-initiated basically the conversation. He asked him to come to jail. Okay. What do you want to talk about? Is there any impropriety in that question? No. Not at all. Particularly where he hadn't invoked his rights yet. Well, he did at some point. Even right after. Okay, he says, I don't want to talk about that. And then the cop says, well, what do you want to talk about? What do you want to ask me? Is there any impropriety in that? You know, I think in some cases maybe you can make an argument for it. I'm not going to go down that route. I don't think it's improper in this case if you said, what do you want to ask me about? The officer purported to have concerns about mental health. If he did, you can ask that question. It's a fair concern of his. From that point, and this goes back to Justice Evans' question, from the point when the officer said, what do you want to talk about? What do you want to ask me? From that point on, isn't it correct to say that the officer, in fact, never questioned him directly about this crime at all? I do disagree, Your Honor. Well, give me an example. At the very end, if you want a direct question, he did say he started talking about that night. Did you hug Diana Harris that night? Who's he? He's the sergeant. The sergeant says, did you hug Diana Harris this night? And then when Joseph started talking about his feelings that night, he says he has a lot of hatred. The officer asked, well, what do you have hatred towards? And he's already talking about the subject of that night. So that, to me, is a question about the offense. And an appropriate time for the officer then, at that point, to re-Mirandize Joseph, if he believed that he had made an indication that was limited to the offense somehow, and then he starts getting into the offense. It's the officer's duty under R.C. and Flores to, at this point, re-Mirandize. These are all fact-intensive cases, aren't they? Yes. Yes. On the facts of this case, is there anything close to what happened here in some other case that says this was improper? I think R.C. and Flores were very similar in the sense that Flores, the guy, kept saying, I don't want to talk, period. And the investigator kept asking him questions, and he said again, I don't want to talk. I don't want to talk. And they continued to interrogate him. How could those facts be anything similar to this? Joseph told police three times here he didn't want to talk, and he kept asking questions. That's similar. The interrogation went on for 15, 30 minutes in R.C. This is even longer here, 45 minutes. He was asked one question about whether he was in Illinois or Indiana. He said, I don't want to talk about that until I talk with an attorney. Yes. The investigator says, okay, what do you want to talk about? Because he said something about, I hate to get your hopes up. Right. And the investigator said, no problem. I was told you wanted to talk to me, and that's why I came back here. So what do you want to talk about? But he then, he said, do you want to talk about anything else? Anything else, your family says no, sorry to get your hopes up. So to me, what he's saying there is I don't want to talk about anything. He said, there's nothing I, do you want to talk about your family? Do you want to talk about anything else? No. He's saying maybe the initial statement related only to the defense, but then he says family and anything else. So he's just saying he doesn't want to talk. Either way, when you, if anything, the second question is. Wait a minute, so it's not appropriate. If you're called back to the station and informed the defendant says he wants to talk with you, and so you go in and you mirandize him and you start asking him some questions, and he says, no, I don't want to talk about that. I hate to get your hopes up. I want to talk to an attorney. That it's not appropriate for the officer to then say, well, what exactly is it you want to be back here for? What do you want to talk about? That's not okay. Well, Your Honor, I'm not talking about a single question. It's 45 minutes of questioning, though. So this isn't like the case of the state. You say it's 45 minutes of questioning. I saw a conversation with the defendant during the vast majority of the talking. Well, it's a conversation with the detective who's there to obtain evidence. He's trained to do that. Sure. Nothing about that is against the law. Well, it is because of the indication. He didn't say he wanted to talk. He's the guy who said, I want to talk to you. Bring him back. I need to talk to Deputy Grisham. He says he wants to talk to you. He then starts asking him questions about it. The defendant asks about the family. He then tells him what he knows about the conversations he's had with the family, and the defendant just keeps going. Your Honor, there were times during this interrogation when it was recognized that interrogators don't necessarily need to contain threats and can be coercive. And the officer's asking about the Ten Commandments, Christianity. That's kind of out of context because that came up very quickly, very briefly. The defendant didn't respond to it, and there wasn't really much said of that. Well, I would argue that that is an interrogation technique that is meant to guilt-trip the defendant into talking about the offense. And he didn't take the bait. Well, eventually he did. Wait a minute. Wait a minute. Your argument is if you use these words at the first 15 minutes, if 40 minutes later the guy says, yeah, you're right, I did it, somehow that now negates everything that transpires in between. Here, in fact, what we've got is there's that statement. The defendant doesn't take the bait. It doesn't go any further. And, yes, as the conversation develops, he does then start talking more and more about it, and eventually starts talking about that night, although he starts talking about it earlier in the evening. He's talking about what happened in the bar, and what went on with his brother, and how he moved back here, and he's wanting to get in business with his brother. This is all the defendant. It's not the interrogator. Well, I found it interesting, I think, in the state's brief where they were citing questions that were asked by the officer and saying, well, this wasn't reasonably likely to elicit an incriminating response, nor was this, nor was this. But then they argued under each of those that they did elicit incriminating responses. And at some point, that's not a coincidence anymore. I mean, this is an interrogator asking a question that's getting what the state is claiming are incriminating responses. It's a videotaped interrogation of a suspect who has a diminished mental capacity, who's huffed at the feet and ankles. So this is an interrogation, and R.C. and Flora is really standing for the proposition. I mean, those cases, it seems to me, give meaning to an invocation of Miranda rights. They're saying, this is not a trivial event. Once this happens, it's going to change the conduct that's expected of an officer. It's not like a case where a defendant invokes Miranda rights and a single question is asked that's kind of ambiguous, could it be an interrogation or not. I think it's clear from these cases that once Miranda rights are invoked, a 45-minute interrogation is definitely prohibited. I mean, to allow officers to do this really undermines the right of the police to test a defendant's invocation of his rights, which I think is what R.C. and Flora are getting at trying to prevent. How much time is allowed? I think 45 minutes is too long. I think it's close to a right-line rule that once an invocation of Miranda has occurred, the interrogation, the question has got to stop.  And then we get into some of the cases the state's talking about, what was that interrogation? So if he says, I don't want to talk about that until I talk to an attorney, there can be no further questions. There should be no further questions. Okay. He just gets up and goes, that's it, we're done. I mean, like I said, in this case, are you going to, is there anything else you want to talk about? Something small like that is maybe reasonable. That's not what happened here. So, yes, I mean, so when we have 45 minutes of prolonged questioning, that's way over the line, clearly improper. And Joseph should have been returned to his cell. He said he was sorry to get the officer's votes up. He realized that he called him back for maybe something that he wasn't ready to get into. So, yes. Counsel, you make another argument about the point in which perhaps the investigator should have re-Mirandized the defendant. Now, I glean as well, as Justice Jarmon does, that you're making this argument regarding the totality of the circumstances and the interview and the length becomes an interrogation. I get that. What's your best case? At what point can you pinpoint was the time in which the investigator should have re-Mirandized this defendant prior to asking any additional questions? You said something earlier about questioning him during that night or a question that prompted talking about that day, evening, et cetera. There was a question when he asked if he had fucked Diana Harris, and that kind of led him to talking about his emotions that night and feeling hatred. And I think once he said that night, instead of saying, why do you have hatred? He should have said, hey, we need to take a step back. Earlier you invoked your Miranda rights. Also, nobody has disputed until now that Joseph has invoked his Miranda rights by making those statements. The state can argue that below. They don't argue that now in court. They can find that below. So, anyway, once the defendant at that point said, started talking about his feelings about that night, it was an appropriate time for the detective to stop the investigation. And what specific questions? What specific? Okay, you talked about the hug. What else do you have in terms of? What do you have hatred about was the question, was the specific question at that point? Because I think at that point it's clear the officer is talking about that night, and he's just begging him to continue talking about it. But the hatred comment, as I recall, wasn't directed towards the victim. It was sort of a sense this defendant had had throughout his life that something in him was a problem for him. Is that fair? No, I don't think so, Your Honor. I mean, it led to statements that have to do with, it led to his confession. So, you know, I think once you start talking about that night, wherever, it doesn't really matter where the hatred come from because we know where it was directed at the end. And I think that's what's important in that regard. The admission of the statement was not harmless, again, a reasonable doubt. There was a lot of evidence in this case, but this is a very persuasive statement. It's the defendant's own words. It has a lot of persuasive power. The state relied very heavily on the statement, started their opening and closing arguments reading the statement. And the defense was also denied really an opportunity to rebut those arguments given the judge's ruling on the involuntary manslaughter instruction because there were also comments in the statement that could have been argued supported involuntary manslaughter or lesser mental state. So, if there are no further questions on the statement, I would just like to briefly talk about the jury instruction. There was some evidence. There's a very low standard for whether a lesser included instruction is required. There was some evidence here at least of involuntary manslaughter and a reckless mental state. This presented medical evidence from a doctor who said Joseph's TBI could have impaired his ability to recognize the consequences of his actions and made an erroneous ruling basically based on a misunderstanding of recklessness, finding that a recklessness instruction isn't warranted if the actions are deliberate. And that's inconsistent with the law. You can be reckless and still have deliberate actions. So, by removing the lesser offense from the jury's consideration and putting them in kind of an all or nothing position, it just made it more likely. Explain how that works, being reckless and still being deliberate. Well, recklessness is a conscious disregard of your actions. So, you can know what you're doing and just choose to disregard the possible outcomes. So, I'm stabbing somebody and I'm consciously disregarding it. Why isn't that? I know I'm causing great bodily harm. How does that not constitute murder? Well, it was up to the jury to determine whether. Well, first they have to be instructed. As a judge, I want to give me a theory of how that doesn't constitute murder. I'm stabbing him. I know I'm stabbing him. And this is something I'm stabbing him repeatedly, that at a minimum, under Section 9-1, defining first degree murder, I know this is creating a strong probability of death or great bodily harm because of what I'm doing. How does this not constitute murder? What about that is somehow a basis for reckless homicide? The medical testimony was that his traumatic brain injury could cause him to disregard the consequences of his actions. So, when he's under distress or drinking alcohol, even his own statements indicate he kind of snatched and maybe has a brain deficiency that doesn't allow him to kind of think ahead, basically. So, he knows what he's doing. He knows what he's doing is wrong, but I think there's a point where he realized what he did was wrong and that it could have caused him great bodily harm or death. And at that point, he is calling police, stopping people on the road. No, he's done that afterwards. I'm talking about as he's stabbing. As he's stabbing. I want to... Well, during the stabbing... Explain how the conscious disregard is recklessness. He's stabbing this guy. Right. How is this not a matter where he is knowingly performing acts which are going to cause death or great bodily harm to this person he's stabbing? Because the medical evidence establishes that he could have been unable to recognize the consequences of his deliberate actions. So, he knows what he's doing, but he can't process the impact of it, basically. And whether, you know, at the end of the day... He can't process the impact of what? Of the stabbing? Of the consequences of his actions? Or creating great bodily harm? What I say, he knows... Was the shrink asked that question? And did he so testify? I don't recall that in this record. Does that mean, doctors, he's stabbing this guy? He didn't understand that this could cause death or great bodily harm, but it was a conscious disregard? Was that specific testimony ever elicited? The specific testimony, Your Honor, was the traumatic brain injury could have caused him... No, see, I asked... Conscious disregard of the consequences of his actions. Counsel, I ask my questions pointedly. And for a reason. So, the question I asked was, was that testimony ever elicited from the defense expert? Could you ask again the question, what testimony? Was it his stabbing the victim that the defendant did not understand? Or he had a conscious... He might have had a conscious disregard of the effects of stabbing his victim. Was that ever asked? Very similarly, yes. I mean... So the answer is, no, that question wasn't asked, but that's the argument you're now making to us about what the testimony means. The testimony that came out was that the traumatic brain injury could have caused him to disregard... I don't remember verbatim the question that preceded it, but it must have been something very close to that to get that answer. I mean, what we have in evidence is testimony saying that the defendant might not have recognized, because of his diminished capacity, the impact of his actions. And that's what recklessness is. I mean, that's what this Jones case is about, where this man deliberately puts his foot on the victim's neck, you know, and knows what he's doing, but yet he did it with a disregard, didn't realize he was going to kill this guy. He stabbed him 16 times. He severed the sternum. One stab was so violent it touched the vertebrae of his back. The guy's driving the car, the truck. He stabs him 16 times, and you say he did that recklessly. Yes, deliberately. The actions were deliberate. And I'm saying not that he did it recklessly. I don't know. I'm saying that there's evidence that, you know, supported an instruction that allowed... So as long as I say I really don't care what the effects of what I'm doing are, I could be guilty of involuntary manslaughter. He's not arguing second-degree sudden intense passion. You're saying if you just don't take into account the fact that 16 stab wounds to the chest and neck could be a problem, then you're good. No, I mean, Your Honor, we're talking about, in this case, somebody with a diminished mental capacity, not a defendant with a normal capacity who's just denying... Now, when I say diminished mental capacity, the picture that people have is not the picture of the defendant that you see. I can't answer that. I don't know. To me... The intention behind the words you use is that he is so incapable of thought that he perhaps just doesn't even understand what he's doing. And, I mean, if you watch the video, you can see that, okay, if that's diminished mental capacity, it's not very... Well, my impression of the video is that this was a very disturbed person. I mean, his behavior in the video was strange, quite frankly. And I don't think it would be that difficult to think that or out of the realm of possibility that a juror would see that and say, I don't know if this man could have processed that. And they had that opportunity? Well, they didn't have the opportunity because the instruction was denied. So they didn't have to consider that. And all they heard was this evidence that he did it, which he basically admits. He didn't testify, but the defense theory was it's not a gun case. He did it. So... Your time's up, Mr. Reyna. You'll have an opportunity to address this again in rebuttal. Thank you, Your Honor. Okay, Mr. Williams. Thank you, Your Honor. Thank you, Mr. Clark. Counsel. Counsel. My name is James R. Williams. I'm behalf of the adult prosecutors. It is my privilege to represent the state before this honorable court. You have to keep your voice up, Mr. Williams. I'm sorry. That's a recording, not an amplifying device. This court has explained that in cases such as this where it's undisputed that the defendant is in custody and that he requests counsel, that the sole issue is whether, from the defendant's perspective, he is thereafter subject to further interrogation. Interrogation has been defined by the United States Supreme Court as words or actions by the police that are reasonably likely to elicit an incriminating response. So, the ultimate question here is whether the police did or said anything likely to elicit an incriminating response. And at no point in this case, from the initial motion, to the hearing, to the trial, to the post-trial motion, to the hearing on that, to the opening brief, to the reply brief, to this oral argument, the defense has not pointed to anything specifically that constituted further interrogation. Instead, they're simply complaining that the conversation continued after the defendant requested counsel. Counsel, I hate to interrupt your flow, but let's get to the point of re-Mirandizing, or stopping the interview sometime into the interview wherein, or the conversation wherein, there was reference to things happening that night as alleged by counsel. Well, on the point of re-Mirandizing, perhaps there may have been a point where that might have been ideal, but I don't think that the officer crossed the line here. The officer didn't do or say anything that was likely to elicit an incriminating response. He didn't take the conversation back there. At worst, the officer was simply responsive to what the defendant was saying. Or, to the extent that he may have asked the question, it was simply seeking clarity. As your honors pointed out, the, you know, after, we're talking three, this defendant summoned this police officer from his home to the jail. Three minutes into the conversation, he says, I want an attorney. It is not at all unreasonable to simply ask for a little clarity, okay, what did you want to talk to me about? I mean, that's all that we have here. Actually, he wasn't, I want an attorney. He said, I just didn't want to talk about that right now until I talked with my attorney. Yes, and to that end, the court found, as Steve argued below, that it was really just a limited invocation of the right. And it's also important to point out that after waiving Miranda, you know, in the first instance, right at the beginning of the conversation, he didn't insist that he wanted to remain silent. There's no suggestion of coercion here whatsoever. This is simply a conversation from which the defendant offered certain, certain, most of this, you know, he talks about, the defense that is, excuse me, talks about this conversation continued for 45 minutes. The questioning was for 45 minutes. The super majority of that has absolutely nothing to do with this case. They're literally just conversing about random, completely unrelated things. As the court found below, as the state argued below, it was the defendant himself who took this conversation back in the direction of the offense and then voluntarily offered statements. In fact, there's a couple times in this record, or in this reporting, where the defendant starts to take the conversation in that direction, and the officer actually stops him and takes it in a different direction, asks if he wants a soda, and that's what he says, he wants a cigarette. They go and get that. That's 10 minutes of the 45 just retrieving the cigarettes and soda. So the officer here really didn't do anything that crossed the line in the state's opinion. Well, can I ask this question just because I think you're there at this point? Counsel identifies the hugging question about hugging this individual and also a question about why the defendant felt this hatred. Those are sort of the two points, those are questions that were delving into that evening and were interrogated in their nature. Can you speak to those? Well, the state disagrees with that. First of all, they're responsive to what the defendant's saying, and nothing about those questions would be reasonably likely to elicit an incriminating response. So to that end, the defendant here has, I mean, first of all, above all else, I would argue the defendant here has really forfeited this argument from the beginning all the way through this appeal. Forfeited it below, forfeited it on appeal by never, ever articulating even one thing specifically that was likely to elicit an incriminating response. Even after I pointed that out in my responsive brief, in his reply still doesn't come back and argue that this was likely to elicit an incriminating response. I would respectfully submit that's probably because he recognizes that these sort of things were so innocuous that they weren't likely to elicit an incriminating response. Now, let's just say to the extent that this was somehow errored and that this is somehow not forfeited because it was somehow adequately framed and articulated and argued below. And I guess to that point, I would just say briefly, this is not a hyper-technical argument. This is not something that's without meaning. But the defendant's failure to point to these things that the officer did or said that elicited this incriminating response, his failure to do that has deprived the state of the opportunity to challenge that argument below, deprived the trial court of the opportunity to make factual findings based on the argument below, and it's deprived this court of adequate record to review this issue. Now, but again, in this hypothetical world where this was adequately argued and framed below, adequately argued and framed on appeal, in any event, this is harmless beyond all doubt. I stabbed my brother to death. That is what the defendant readily admitted to numerous people. That's what he admitted to the 911 operator and an audio recording that was played for the jury. That's what he admitted to the Armand family when he flagged them down and sought their assistance immediately after he stabbed his brother to death. That's what he immediately admitted to the officers as soon as they arrived on the scene. That's what he admitted to each of his sisters in separate jail visits. So in total, there were five different people that testified that the defendant readily admitted to them that he stabbed his brother. And, of course, he's the only other person with cause, so he's the only person that could have done this. So there's absolutely no doubt that the defendant committed the act that caused death. There's simply no doubt on that point. With respect to his intent, there's similarly no doubt that the defendant intended to kill. Specific intent can be and normally is inferred from the facts surrounding the circumstances, such as the character of the attack, the use of a deadly weapon, the nature and extent of the victim's injuries. Here, the defendant devoted time to opening the folding knife, attention to targeting his brother's chest, neck, and heart area, and energy to inflicting, Your Honor's mentioned 16. I think that the record said 18, but in any event, numerous stab wounds to this most vital area. So given this overwhelming evidence, even if it was somehow an error to deny this motion to suppress this video recording confession, the evidence otherwise overwhelmingly established his guilt as the first-degree murderer. Now, just briefly, with respect to this jury instruction, the defendant argues that the court erred in not giving the involuntary manslaughter instruction. Our Supreme Court has identified five factors to determine whether such an instruction is warranted. Those include the disparity in size and strength between the defendant and the victim, the ratio of the altercation and the severity of the injuries, whether the defendant used a weapon, whether the defendant inflicted multiple wounds, whether the victim was defenseless. Here, we have a victim who is completely defenseless while driving down the interstate when the defendant opens up his folding knife and stabs him 16 to 18 times while targeting, again, the most vital area, the heart, chest, and neck area. There's nothing about this case that suggests that this was somehow unintentional or reckless. The idea that someone can unintentionally stab a person 16 or 18 times respectfully makes very little sense to me. It's hard to understand how it can possibly be argued that someone unintentionally took the time to inflict 16 to 18 different stab wounds. Unless this court has any further questions, we'll take a three-time round. Okay. Thank you, Mr. Williams. Mr. Randolph, any rebuttals? Just briefly, Your Honors. The case for Fisher arguments of red herring, this is the same exact argument that was addressed and raised below. The state of incidents brief that is filed in the supplemental petition below addressing and raising all of these arguments. The problem is the state is applying the wrong standard. I mean, the question isn't whether the question was reasonably likely there was preliminary responses at this point. Under R.C., because there's an indication, the question is whether police scrupulously honored the indication. And the first factor in determining whether that happened is whether the interrogation was immediately halted, and it wasn't. This is the precise type of police behavior that the Supreme Court sought to prohibit in R.C. That opinion stands from the proposition that the court does not want police tinkering with defendants' constitutional rights because they're important. And that's what happened in this case. There was no final point. There's no limited indication of rights. The cases at the state sites for that, defendants made express statements saying, I'm not going to write something down, but I'll talk to you about it. There's nothing like that here. The defendant said he did not want to talk. You know, we always like to hope that our opinions give the police some sort of guidance on how they're supposed to conduct these things. I'm trying to figure out, under this set of facts, under what circumstance, at what point in time, do we tell the police officers, you now had to stop and re-Mirandize this defendant? Is it if the inflection of his voice is such that he's starting to talk about the offense? If he says something about actually committing the offense? If he sounds like he's feeling like he might want to talk about the offense? At what point do we tell the police, okay, now you have to stop and re-Mirandize him? These are the kind of questions that R.C. is trying to eliminate. I mean, by drawing more of a bright line. By saying, once there's an indication, the interrogation has to stop. I mean, certainly at the very least. Okay, so we're back to the very first conversation. You say, as soon as he said, I don't want to talk about that until I talk to my lawyer, everything stops. I want to give you the full answer, because that's part of it. That's the Supreme Court saying that. They're saying all interrogation must stop after this, because it's important. It's an indication. But then if we're saying this is limited somehow, or he wants to talk about his family, then at least if there's an acknowledgment that he has said he does not want to talk about the offense, then when he starts getting back into the offense, at that point the police have to re-Mirandize him. To whatever extent the police or the court finds the indication was limited, once that limitation has been crossed, that's when police need to re-Mirandize. In this case, the safest thing for the officer to do would have been, after the indication, he asks this follow-up question, what do you want to talk about? The defendant says, I don't want to talk about my family, sorry to disappoint you. That's when this should have ended. If there were lingering concerns about his mental health, the sergeant, the lead detective on the investigation, was not the person to handle them. It just gives an appearance of impropriety. He should have called a mental health counselor to avoid any kind of impropriety. So the state loses the confession. What else have they got? They have circumstantial evidence of intent. A lot of direct evidence that he did this. As I was saying, he's admitting to having committed the murder. He made a 911 call saying he did it. He told various witnesses he did it. So the amount of evidence that he did, though, is problematic in this case because the question isn't, did he do it? It's, was there intent to cause great bodily harm or death? So there's too much evidence, then, that somehow works to the benefit of the defendant? Well, I wouldn't say it works to his benefit. He's not in your prison sentence. I think it would be correct to say that if we conclude the trial court did not err in denying the instruction in voluntary manslaughter, then the admission of the confession could not have mattered. If there was instruction, the confession, the admission, the failure to admit the confession would have been somewhat mitigated by the instruction. I agree with that. Is that what you're getting at? No. No? Let me restate my question. Assuming we agree that the trial court did not err in giving an instruction on involuntary manslaughter, so the only issue before the jury was guilty or not guilty of first-degree murder, given the strength of the State's case aside from the statements the defendant made in this interrogation, wouldn't that case demonstrate that any error would then have been harmless beyond a reasonable doubt? I don't understand your question, Your Honor. Well, I may be stating it awkwardly, and I apologize. One more time. At issue is whether or not the statements the defendant made in this videotape were properly admitted. You're saying they shouldn't have been admitted. Let's assume two things from this court. First, we agree that the trial court was correct in not giving an involuntary manslaughter instruction. Second, we also agree that the jury should not have heard the videotape statements that you're saying were improper. Under those circumstances, wouldn't the admission of that videotape be harmless error beyond a reasonable doubt because the evidence that the defendants killed is overwhelming? No. I mean, this is just then the same question, is this harmless beyond a reasonable doubt? No, because it's such persuasive evidence. I mean, if the admission didn't matter to the verdict, the State wouldn't have sought to admit it in the first place and wouldn't have focused an entire closing argument around it. I mean, they basically read the admissible portions. That was their closing argument. Okay. Give me your closing argument, a brief example of it under those circumstances where the State, let's assume that the evidence was kept out. What would you have argued to the jury as far as the defendant being not guilty of murder? Still no involuntary manslaughter? Right. Right. It would be a similar argument if the State didn't prove intent. The 16 stab wounds wouldn't have been sufficient? Well, no, Your Honor, I'm glad you said it like that because it is sufficient. I mean, the evidence would have been sufficient without the confession, but that does not mean that the admission of the confession was harmless beyond a reasonable doubt because while the jury might have found him guilty without the confession, we don't know that they would have because what's left without the confession is circumstantial evidence of intent instead of a direct statement or direct statements, 45 minutes of statements from the defendant. Well, the defendant made statements that he inflicted the harm that caused the death, whether or not they came in the interview or not. Those statements were coming in. But he doesn't talk about his mental state in any of those statements? He's saying, I stabbed my brother. I just stabbed my brother, but he doesn't explain why. What's the issue of mental state, assuming that the court is correct to not give an involuntary manslaughter instruction? Is there some question about whether he performed these acts knowing that they would create a strong probability of death or great bodily harm? Yes, I believe there was a question. I mean, that's why you— Perfect. Please give a hands up, counsel. Thank you for your presentation. We'll take this matter and advise you to be recessed.